UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON R. NDREMIZARA, | ) |
| Plaintiff, | ) No. 12 C 07521 |
| v. | ) Judge Edmond E. Chang |
| ZURICH AMERICAN INSURANCE COMPANY, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jason Ndremizara brought this race and age discrimination action against Defendant Zurich American Insurance Company.[1] R. 8, Am. Compl. Ndremizara unsuccessfully applied for four actuarial positions at Zurich in October 2011. Pl.'s Resp. DSOF ¶ 13; PSOF ¶ 10. According to Ndremizara, Zurich did not hire him for these positions because of his race and age. R. 32, Pl.'s Resp. Br. at 1. Zurich now moves for summary judgment on all claims. For the reasons discussed below, Zurich's motion for summary judgment [R. 28] is granted.

---

[1]The Court has subject matter jurisdiction over this federal-question case under 28 U.S.C. § 1331. Citations to the docket are "R." followed by the entry number and, when necessary, the page/paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Zurich's Statement of Facts) [R. 30]; "PSOF" (for Ndremizara's Statement of Facts) [R. 36]; "Pl.'s Resp. DSOF" (for Ndremizara's Response to Zurich's Statement of Facts) [R. 36]; and "Def.'s Resp. PSOF" (for Zurich's Response to Ndremizara's Statement of Facts) [R. 39], followed by the paragraph number.

1

## I. Background

The Court views the evidence in the light most favorable to the non-movant, here Ndremizara, in deciding a motion for summary judgment.[2] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On October 26, 2011, Ndremizara, an African-American over the age of forty, applied for four actuarial positions at Zurich through Zurich's website. Pl.'s Resp. DSOF ¶ 13; PSOF ¶ 10. Zurich identified these positions by "requisition" numbers. The positions that Zurich applied for were requisition numbers 25649 (Actuarial Analyst), 25648 (Actuarial Analyst), 25572 (Predictive Modeler), and 25573 (Actuarial Analyst – Predictive Modeling). Pl.'s Resp. DSOF ¶ 13. Zurich did not hire Ndremizara for any of these positions. PSOF ¶ 4; Def.'s Resp. PSOF ¶ 4. Ndremizara believes that he was not hired because of his race and age. Pl.'s Resp. Br. at 1.

In response, Zurich claims that two of these positions, 25572 and 25573, were cancelled: it did not hire anyone for either position. DSOF ¶¶ 18-19; R. 30-3, Def.'s Exh. 3, Graham Decl. ¶¶ 7-8. And for the other two positions, 25649 and 25648,

---

[2]Because the Court views the evidence in the light most favorable to the non-moving party, typically the source of factual citations is the non-movant's Local Rule 56.1 fact statements. Ndremizara, however, was representing himself while this motion was briefed, and he provides very few factual citations to the record in his brief, and fewer in his Local Rule 56.1 Statement of Facts. He was provided the Local Rule 56.2 notice to pro se litigants, and is himself highly educated and did serve discovery requests in the case. (Ndremizara has since retained counsel, but he has not requested leave to amend his already-filed briefs and fact statement, *see* R. 41 (allowing three weeks to file such a motion if good cause could be shown for it).) In evaluating the factual record, the Court credits Ndremizara's factual assertions when it can find support for them, or when they are admitted by Zurich. Otherwise, the Court is forced to rely on Zurich's portrayal of the facts (again, when supported by the record). Thus, although the Court has viewed the evidence in the light most favorable to Ndremizara, many of the record citations are to Zurich's statement of facts.

Zurich claims that Ndremizara was not considered because he submitted his application after the company applied a random culling technique to reduce the number of applications it received to a more manageable number. DSOF ¶¶ 14-17. Zurich elaborates that after a requisition receives business approval from the company, the requisition is assigned to a recruiter, who posts the job and position details to several job boards. Pl.'s Resp. DSOF ¶ 10. When Zurich receives more than fifty applications for a given position, the recruiter may use a data management technique (DMT) to randomly eliminate applicants from consideration. DSOF ¶ 11. After applying the DMT, the recruiter conducts initial screenings over the phone with the applicants who are still under consideration and then submits the qualified candidates' applications to the hiring manager. *Id.* ¶ 12. Finally, the hiring manager interviews select candidates and eventually decides who Zurich should hire. *Id.* Requisition 25649 attracted a total of 280 applicants, Pl.'s Resp. DSOF ¶ 16, and requisition 25648 attracted 225, *id.* ¶ 14. Therefore, because of the large number of applicants, the recruiters assigned to manage the requisitions applied a DMT to both positions on October 11, 2011. DSOF ¶¶ 14-17. Ndremizara, however, applied to both positions on October 26—*after* the DMT was applied—and was therefore not considered for the positions. Pl.'s Resp. DSOF ¶ 13.

Because he was not hired for these four positions, Ndremizara filed a *pro se* complaint in this Court, alleging race discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as well as age discrimination in violation of the Age Discrimination in Employment Act (ADEA). *See* Am. Compl.

3

¶ 9.[3] After limited discovery, Zurich moved for summary judgment, arguing both that Ndremizara has failed to make out a *prima facie* case of discrimination and that its reasons for not hiring Ndremizara were legitimate rather than discriminatory. Def.'s Br. at 5-9. As discussed more fully below, Ndremizara does not believe any of the explanations that Zurich has offered.

## II. Legal Standards

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

---

[3]This complaint is one of three *pro se* complaints that Ndremizara filed on September 19, 2012. *See* Compl., *Ndremizara v. Coventry Health Care*, No. 12 C 07520 (N.D. Ill. Sept. 19, 2012), ECF No. 1; Compl., *Ndremizara v. KPMG, LLP*, No. 12 C 07522 (N.D. Ill. Sept. 19, 2012), ECF No. 1. One of these cases was voluntarily dismissed after Ndremizara received limited discovery from the defendant, *see* Notice of Voluntary Dismissal, *Coventry Health Care*, No. 12 C 07520 (N.D. Ill. July 1, 2013), ECF No. 31, and the other was dismissed by the district court at the screening stage, *see KPMG*, No. 12 C 07522 (N.D. Ill. Oct. 15, 2012), ECF No. 7. In this case, despite the relatively thin set of facts alleged in the complaint, the Court allowed limited discovery to determine whether Zurich's alleged nondiscriminatory reasons for not hiring Ndremizara were legitimate. *See* R. 19, 2/19/13 Minute Entry; R. 22, 4/4/13 Minute Entry.

4

A plaintiff seeking to prove race- or age-based discrimination may use either the direct or the indirect method of proof. *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013) (age discrimination); *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (racial discrimination).[4] Under the direct method, the plaintiff can meet his burden by presenting either direct or circumstantial evidence. *Teruggi*, 709 F.3d at 659; *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin*, 420 F.3d at 720 (internal quotation marks and citation omitted). On the other hand, circumstantial evidence allows the trier of fact "to infer intentional discrimination by the decisionmaker." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir 2013). This may include evidence of "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

---

[4]Ndremizara's race-discrimination claim is based on both Title VII and 42 U.S.C. § 1981. *See* Am. Compl. ¶ 9; Pl.'s Resp. Br. at 1. But "the methods of proof and elements of a [Section 1981] case are essentially identical to those in a Title VII case." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (alteration in original) (internal quotation marks and citation omitted). So there is no need to separately discuss Ndremizara's § 1981 claim.

5

Under the indirect method, and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), discrimination may be proven through a burden-shifting framework. First, the plaintiff must establish a *prima facie* case of discrimination. *Id.* This requires the plaintiff to show that "(1) he is a member of a protected class; (2) he was qualified for the applicable positions; (3) he suffered an adverse employment action; and (4) similarly-situated persons not in the protected class were treated more favorably." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). After the plaintiff has established a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp.*, 411 U.S. at 802. Finally, if the employer meets this burden, the plaintiff must prove by a preponderance of the evidence that the employer's reasons are mere pretext for discrimination. *Id.* at 804.

As this Court described in *Luster-Malone v. Cook Cnty.*, No. 11 C 09227, 2013 WL 6508070, at *3 (N.D. Ill. Dec. 12, 2013), the direct/indirect-method framework has "taken on a life of its own" since its creation. Numerous corollaries and rules have sprung forth from courts' application of the framework over time, resulting in confusion and, too often, the imposition of a too-high burden on plaintiffs. This has led to a growing consensus on the Seventh Circuit for replacing this framework: a majority of active-service Seventh Circuit judges have opined that the direct/indirect-method analytical structure has done more harm than good, and should be replaced with the more straightforward question of "whether a reasonable jury could infer prohibited discrimination." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d

733, 737 (7th Cir. 2013); *see also Coleman*, 667 F.3d at 863 (Wood, J., concurring). By simplifying the approach, the Seventh Circuit sought to return to the "statutory question of discriminatory causation," *see Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 680 (7th Cir. 2012), thereby avoiding "the confusing 'snarls and knots' of this ossified direct/indirect paradigm," *Hitchcock*, 718 F.3d at 737 (quoting *Coleman*, 667 F.3d at 863).[5] But the Seventh Circuit has not definitively jettisoned all application of the direct/indirect-method framework. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) (noting that the question is "ultimately" *Hitchcock*'s reasonable-jury analysis, but nevertheless applying in full the direct/indirect framework); *Tate v. Ancell*, Nos. 11-3252, 12-2694, 2014 WL 186353, at *8-10 (7th Cir. Jan. 17, 2014) (unpublished). So the Court therefore will evaluate Ndremizara's claims using both the direct/indirect framework and the more straightforward reasonable-jury analysis.

### III. Analysis

Ndremizara argues that Zurich refused to hire him for all four positions because of his race and age.[6] Pl.'s Resp. Br. at 1. Ndremizara does not attempt to show discrimination—either race-based or age-based—under the direct method.

---

[5]As discussed in *Luster-Malone*, this approach is faithful to both Rule 56 and *McDonnell-Douglas*. *Luster-Malone*, 2013 WL 6508070, at *3.

[6]In his amended complaint, Ndremizara alludes to applying to "more than a half dozen positions" at Zurich. Am. Compl. ¶ 13(f); *see also* Pl.'s Resp. Br. at 1, 10, 13 (claiming that he has applied for "dozens" of actuarial positions at Zurich). He acknowledges, however, that only four positions—those analyzed in this section—are at issue in this case. *See* Pl.'s Resp. DSOF ¶ 13; R. 37, Pl.'s Second Resp. Br. at 5; *see also* 4/4/13 Minute Entry (limiting discovery to these four positions).

7

Instead, he proceeds under the indirect method, arguing that all of Zurich's alleged nondiscriminatory reasons for not hiring him are pretextual. *See id.* at 1, 5, 9-10, 13 (arguing that all of Zurich's explanations are lies); Pl.'s Second Resp. Br. at 6.

Turning first to requisitions 25572 and 25573, Zurich offers a simple explanation for why it did not hire Ndremizara: the company did not hire *anyone* for those positions. Instead, it cancelled the requisitions altogether. DSOF ¶¶ 18-19. In addition to serving as a legitimate, nondiscriminatory reason for not hiring Ndremizara, this fact prevents Ndremizara from establishing a *prima facie* case of discrimination. *See* Def.'s Br. at 6, 8. Because Zurich did not hire anyone for these positions, there are no similarly-situated individuals that were treated more favorably than Ndremizara. *Id.* at 6; *see McGowan*, 581 F.3d at 579.

In response, Ndremizara argues that he can establish a *prima facie* case of discrimination because he contends that Zurich did not actually cancel positions 25572 and 25573. *See* Pl.'s Resp. Br. at 3-5, 9-10; Pl.'s Second Resp. Br. at 3 (arguing that Zurich failed to provide evidence demonstrating that Zurich cancelled these positions). But Zurich did provide evidence of these cancellations by submitting affidavits, which a party may use to support its summary-judgment motion. *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(4). An affidavit from Valerie Graham, one of Zurich's recruiting managers, clearly states that both requisitions were cancelled and that no one was hired for either position. Graham Decl. ¶¶ 7-8. Furthermore, the records for both positions confirm Graham's affidavit. The code "Requisition Filled or Cancelled" was added to applicants' files for both positions on January 30, 2012, and again on

8

April 27, 2012, for several additional applicants to the 25573 position, including Ndremizara. *See* R. 30-7, Def.'s Exh. 7; R. 30-8, Def.'s Exh. 8. Together, Graham's affidavit and the records confirm that the positions were actually cancelled.

Ndremizara argues, however, that because the recruiter did not code his application for requisition 25573 as "Requisition Filled or Cancelled" until this later date, April 27, the recruiter actually considered his application. *See* PSOF ¶ 10; Pl.'s Resp. Br. at 8. Ndremizara believes that he was considered for this position because he applied under the name Jason Ndremizara, instead of his old name, Remi Randremizara, like he did for the other three positions. Pl.'s Resp. Br. at 8. In other words, Ndremizara believes that Zurich was tricked into reviewing his application because it did not recognize his new name, and that when it realized it was actually him, it rejected his application because of his race and age. *See* Pl.'s Second Resp. Br. at 3. But in making this argument, Ndremizara ignores that the record for 25573 reflects that the recruiter cancelled this position on January 30, just as it did for 25572. *See* Def.'s Exhs. 7, 8. Moreover, it was not just Ndremizara's application that the recruiter later coded as cancelled on April 27; many other applicants received that same coding on that day. *See* Def.'s Exh. 8. Based on these circumstances, it would be asking too much of a reasonable jury to conclude that Zurich rejected Ndremizara's application on this later date because it was targeting Nremizara specifically. The fact that there were two dates for the cancellation coding for requisition 25573 is not evidence of pretext.

9

Ndremizara also argues that Zurich's explanation that these two positions were cancelled is pretextual because the company actually copied "the best candidates" to another requisition. Pl.'s Resp. Br. at 9-10; Pl.'s Second Resp. Br. at 4-5. Ndremizara is correct that several applicants' files for requisition 25572 are coded "Candidate Copied to Req." Def.'s Exh. 7 at Zurich000006. But this coding does not give rise to an inference of discrimination. For one, Ndremizara assumes, without evidentiary support, that the recruiter copied these applicants to other positions that were not cancelled. *See* Pl.'s Resp. DSOF ¶ 19. But it is just as possible that the recruiter instead copied these applicants *into* the 25572 folder. These applicants were "Copied to Req" between December 18, 2011, and January 29, 2012, *before* Zurich cancelled the position on January 30, 2012. *See* Def.'s Exh. 7 at Zurich000006, 8-9. The Court makes no finding one way or the other. It just notes that either interpretation is possible and that, even drawing all inferences in Ndremizara's favor, the record alone does not raise an inference of discrimination. Instead, because no one was hired for *this* position (which is the basis of Ndremizara's complaint), Ndremizara cannot establish a *prima facie* case of discrimination. Moreover, it provides Zurich a legitimate, nondiscriminatory reason for not hiring Ndremizara.

Finally, although the Court might have granted a motion to compel Zurich to explain this "Copied to Req" coding in the applicant list, Ndremizara made no such motion. And on its face, the coding does not raise a genuine dispute that this maneuver was designed to discriminate against Ndremizara. A reasonable jury

could not make the leap Ndremizara asks it to make—it would have to conclude that Zurich's total cancellation of two requisitions (each attracting over 100 applicants) was in fact motivated by its desire to not hire Ndremizara because of his race and age. No reasonable fact finder could make that leap. In short, for requisitions 25572 and 25573, Ndremizara has not provided the factual support necessary to rebut Zurich's explanations under either the familiar burden-shifting framework or under the reasonable-jury standard.

Turning last to requisitions 25649 and 25648, Zurich explains that it applied a data management technique to both positions on October 11, 2011. DSOF ¶¶ 14-17. The applicants who applied *after* the DMT—including Ndremizara, who applied on October 26—were not considered for either position. *Id.* ¶¶ 15, 17; Pl.'s Resp. DSOF ¶ 13. Zurich then hired applicants who applied before Ndremizara and who survived the DMT. DSOF ¶¶ 15, 17. Zurich argues that because Ndremizara applied *after* the DMT, Ndremizara is not able to establish the fourth element of the *prima facie* case: that Zurich treated similarly situated persons not in the protected class more favorably than Ndremizara. Def.'s Br. at 7; *see also McGowan*, 581 F.3d at 579. In other words, Ndremizara cannot demonstrate that Zurich treated any applicants who, like he, also applied *after* the DMT more favorably than Ndremizara. Zurich also argues that even if Ndremizara could establish a *prima facie* case, the DMT is a legitimate, nondiscriminatory reason for not hiring Ndremizara. Def.'s Br. at 8.

In response, Ndremizara argues that Zurich is also lying about its DMT process. Pl.'s Second Resp. Br. at 2. He claims that Zurich has not proven that it

11

randomly applies the DMT. *Id.* at 2, 6. Instead, he believes that Zurich's recruiters manually enter the "DMT Applied" code whenever they want to eliminate a particular applicant. *Id.* at 2. Again, by submitting affidavits from Valerie Graham, Zurich did provide record evidence that it randomly applied a DMT to both positions. *See* R. 30-2, Def.'s Exh. 2, Graham Aff.; Graham Decl. ¶ 6. The Court carefully considered whether Graham's affidavits were sufficiently based on personal knowledge. To be sure, the affidavits could have been more clearly drafted. For example, the affidavit discussing requisition 25649 is ambiguous about who the recruiter was for that position; Graham attests that "*the recruiter* applied" the DMT, but she does not identify the recruiter or explain whether Graham was the recruiter's direct supervisor. Graham Aff. ¶ 7 (emphasis added). But Zurich's records for requisition 25649 support all of Graham's assertions: the records show that the recruiter applied a DMT on October 11. *See* R. 30-6, Def.'s Exh. 6. And Ndremizara admits that he did not apply for this position until October 26. Pl.'s Resp. DSOF ¶ 13. Graham's affidavit supporting requisition 25648 is not as explicit as the affidavit for requisition 25649, noting only that Ndremizara "was not even considered for [the 25648 position] because the position was filled by someone who applied for the position before he did." Graham Decl. ¶ 6. Despite the affidavit's comparative lack of specificity, the accompanying record does tell the same story as for 25649—the recruiter applied the DMT on October 11. R. 30-5, Def.'s Exh. 5. Ndremizara does not challenge the reliability of Zurich's business records or Graham's ability to review and interpret them, and he offers no factual support to

contradict either the affidavits or the records. Therefore, Zurich's explanation remains unrebutted.

Ndremizara next points out several possible flaws in Zurich's records that he believes undermine Zurich's claims about the DMT process. First, he notes that the DMT that Zurich applied to requisition 25573 did not reduce the number of applicants to fifty or fewer. *See* Pl.'s Resp. Br. at 5-6. As a result, he believes that the DMT process was not actually random. *Id.* But Zurich's statement of facts, which is supported by Graham's affidavit, explains that the recruiters apply the DMT only when the number of applicants exceeds fifty; Zurich does *not* claim, as Ndremizara suggests, that the DMT then reduces the number of applicants to fewer than fifty. *See* DSOF ¶ 11; Graham Decl. ¶ 4 ("The recruiter can use data management techniques (DMT) when there are more than fifty job seekers for a requisition to reduce the number of job seekers that must be considered."). Ndremizara also emphasizes that the applicants who were ultimately hired were hired after he applied. *See* Pl.'s Second Resp. Br. at 6; Pl.'s Resp. DSOF ¶ 17. Although that is true, Zurich explains that those who were hired not only applied before Ndremizara, but, more importantly, applied before the DMT was applied. DSOF ¶¶ 15, 17.

Finally, Ndremizara correctly points out that the DMT coding was applied to applicants' files on different dates and that some of the DMT dates in Zurich's records for requisition 25573 are not visible. Pl.'s Resp. Br. at 6; *see also* Def.'s Exh. 7 at Zurich00006-8 (showing that the DMT was applied on both November 14, 2011, and December 16, 2011, for requisition 25572); Def.'s Exh. 8 at Zurich000010, 13

(showing that the DMT was applied on both October 27, 2011, and April 27, 2012, for requisition 25573). The redacted and inconsistent DMT dates, however, occur only in requisitions 25572 and 25573—the requisitions that Zurich cancelled. The DMT has no bearing on Zurich's legitimate, nondiscriminatory explanation for not hiring Ndremizara for either of those requisitions because it does not rely on the DMT at all. Even if the DMT was applied inconsistently for those two positions, those positions were still cancelled. And for the two positions for which the DMT is Zurich's legitimate, nondiscriminatory reason for not hiring Ndremizara, requisitions 25649 and 25648, Zurich uniformly applied the DMT on the same date (October 11, 2011). *See* Def.'s Exh. 5 at Zurich000001; Def.'s Exh. 6 at 1-2. The differing DMT dates in requisitions 25572 and 25573 do not help Ndremizara show pretext or move him any closer to meeting the reasonable-jury standard.

In sum, the affidavits and the business records support Zurich's explanation that it randomly applied a DMT to both requisitions 25649 and 25648. Therefore, under the indirect method, even assuming that Ndremizara could make out a *prima facie* case of discrimination against Zurich, Ndremizara has not shown that Zurich's legitimate, nondiscriminatory reason for not hiring him was pretextual. The Court grants summary judgment on requisitions 25649 and 25648 as well.

## IV. Conclusion

For the reasons stated, the Court grants Zurich's motion for summary judgment [R. 28] on all of Ndremizara's claims.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 28, 2014